# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### WACO DIVISION

| | | |
|---|---|---|
| **WSOU INVESTMENTS, LLC D/B/A** | § | **CIVIL ACTION 6:20-cv-00489-ADA** |
| **BRAZOS LICENSING AND** | § | **CIVIL ACTION 6:20-cv-00492-ADA** |
| **DEVELOPMENT,** | § | **CIVIL ACTION 6:20-cv-00495-ADA** |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | |
| | § | |
| **ZTE CORPORATION, ZTE (USA)** | § | |
| **INC.; AND ZTE (TX), INC.,** | § | |
| *Defendants.* | § | |
| | § | |

**PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF**

## TABLE OF CONTENTS

Table of Contents ................................................................................................................. i

Table of Authorities ............................................................................................................ iii

Exhibit ................................................................................................................................. v

I.      Legal Standards ....................................................................................................... 1

        A.      Claim Construction Generally ..................................................................... 1

        B.      Indefiniteness .............................................................................................. 2

II.     U.S. Patent No. 7,487,240 (Case No. 6:20-cv-00489) ............................................ 2

        A.      Overview of the '240 Patent ........................................................................ 2

        B.      Terms with Disputed Constructions ............................................................ 3

                1.      "verifying connectivity in the network relating to at least
                        Layer-2 and Layer-3 objects" (claims 1, 6, and 13) ......................... 3

                2.      "a given containment hierarchy" (claims 1, 6, and 13) ..................... 3

                3.      "user-input specification" (claims 1, 6, and 13) .............................. 7

                4.      "the containment hierarchy affected by the connectivity
                        verification result[]" (claims 1, 6, and 13) ..................................... 7

III.    U.S. Patent No. 8,147,071 (Case No. 6:20-cv-00492) ............................................ 8

        A.      Overview of the '071 Patent ........................................................................ 8

        B.      Terms with Disputed Constructions ............................................................ 9

                1.      "the processor" / "wherein the processor is configured to"
                        (claims 1, 9, 13, and 14) ................................................................. 9

                2.      "movement signalling" / "receiv[ing] movement signalling
                        associated with the movement of the projector" /
                        "corresponding movement signalling" (claims 1, 9, 13, and 14) ....... 9

                3.      "discriminate" / "discriminate a movement criterion" / "the
                        processor is configured to discriminate a movement criterion"
                        (claims 1, 13, 14) ........................................................................... 9

                4.      "provide associated image data signalling to project associated
                        image data" (claims 1, 13, 14) ........................................................ 9

**IV.    U.S. Patent No. 9,258,232(Case No. 6:20-cv-00495)** .......................................................14

    **A.    Overview of the '232 Patent** ....................................................................14

    **B.    Terms with Disputed Constructions** ........................................................14

        **1.    "flow control" (claims 1)** ...............................................................14

        **2.    "transmission over a link" (claims 1 & 14)** ..................................16

        **3.    "period of congestion" (claims 1 & 14)** .......................................17

        **4.    "rate limiting" (claims 1 & 14)** ....................................................17

        **5.    "instructions for execution by a traffic flow control system for performing flow control on a flow of data packets for transmission over a link" (claim 14)** .......................................18

# TABLE OF AUTHORITIES

## Cases

*Azure Networks, LLC v. CSR PLC,*
  771 F.3d 1336 (Fed. Cir. 2014) ............................................................................ 1

*Blue Calypso, Inc. v. Groupon, Inc.,*
  93 F. Supp. 3d 575 (E.D. Tex. 2015) ............................................................... 7, 17

*CloudofChange, LLC v. NCR Corp.,*
  No. 6-19-CV-00513-ADA, 2020 WL 4004810 (W.D. Tex. July 15, 2020) ......................... 1, 2

*Collaborative Agreements, LLC v. Adobe Systems Inc.,*
  Case No. A–14–CV–356–LY, 2015 WL 2250391  (W.D. Tex. 2015) ................................... 19

*Comark Commc'ns, Inc. v. Harris Corp.,*
  156 F.3d 1182 (Fed. Cir. 1998) ........................................................................... 1

*Crossroads Sys., (Texas), Inc. v. Chaparral Network Storage, Inc.,*
  No. A 00 CA 217 SS, 2000 WL 35731852 (W.D. Tex. July 27, 2000) ................................. 19

*In re Beauregard,*
  53 F.3d 1583 (Fed. Cir. 1995) ........................................................................... 19

*Lecat's Ventriloscope v. MT Tool & Mfg.,*
  351 F. Supp. 3d 1100 (N.D. Ill. 2018) ............................................................ 5, 11, 16

*Nautilus, Inc. v. Biosig Instruments, Inc.,*
  572 U.S. 898 (2014) .................................................................................. passim

*Phillips v. AWH Corp.,*
  415 F.3d 1303 (Fed. Cir. 2005) ...................................................................... 1, 7, 14

*Sonix Tech. Co. v. Publ'ns Int'l, Ltd.,*
  844 F.3d 1370 (Fed. Cir. 2017) ........................................................................... 2

*Spansion, Inc. v. Int'l Trade Comm'n,*
  629 F.3d 1331 (Fed. Cir. 2010) .................................................................... 5, 11, 16

*Toshiba Corp. v. Imation Corp.,*
  681 F.3d 1369 (Fed. Cir. 2012) ......................................................................... 15

*USB Bridge Sols., LLC v. Buffalo Inc.,*
  1-17-CV-001158-LY, 2020 WL 1906898 (W.D. Tex. Apr. 17, 2020) ............................... 7, 17

*Whirlpool Corp. v. Ozcan,*
  No. 2:15-CV-2103-JRG, 2016 WL 7474517 (E.D. Tex. Dec. 29, 2016) ..................... 5, 11, 16

*Williamson v. Citrix Online, LLC*,
  792 F.3d 1339 (Fed. Cir. 2015)............................................................................ 18

*Zeroclick, LLC v. Apple Inc.*,
  891 F. 3d 1003 (Fed. Cir. 2018)........................................................................... 18

**Statutes**

35 U.S.C. § 112 .......................................................................................................... 2

**Rules**

37 CFR §1.72 ............................................................................................................ 15

MPEP §608.01(b) (8th ed. Rev. 7 July 2008).......................................................... 15

**EXHIBIT**

| Exhibit | Description |
|---------|-------------|
| A | ZTE's Invalidity Contentions (served Jan. 6, 2021). |

Plaintiff WSOU Investments, LLC d/b/a Brazos License and Development ("WSOU") respectfully submits this Opening Claim Construction Brief.

## I.    Legal Standards

### A.    Claim Construction Generally

The general rule is that claim terms are generally given their plain-and-ordinary meaning. *Phillips* v. *AWH Corp.,* 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*)*, cert. denied*, 546 U.S. 1170 (2006); *Azure Networks, LLC v. CSR PLC,* 771 F.3d 1336, 1347 (Fed. Cir. 2014), *vacated on other grounds by* 135 S. Ct. 1846, 1846 (2015) ("There is a heavy presumption that claim terms carry their accustomed meaning in the relevant community at the relevant time."). The plain and ordinary meaning of a term is the "meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Philips,* 415 F.3d at 1313. "'Although the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant* v. *Advanced Micro-Devices, Inc.,* 848 F.2d 1560, 1571 (Fed. Cir. 1988)). Although extrinsic evidence can also be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips,* 415 F.3d at 1317 (quoting *C.R. Bard, Inc.* v. *U.S. Surgical Corp.,* 388 F.3d 858, 862 (Fed. Cir. 2004)).

This Court recently explained that "[t]he 'only two exceptions to [the] general rule' that claim terms are construed according to their plain and ordinary meaning are when the patentee (1) acts as his/her own lexicographer or (2) disavows the full scope of the claim term either in the specification or during prosecution." *CloudofChange, LLC v. NCR Corp.*, No. 6-19-CV-00513-ADA, 2020 WL 4004810, at *2 (W.D. Tex. July 15, 2020) (quoting *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). "To act as his/her own lexicographer, the patentee must 'clearly set forth a definition of the disputed claim term,' and 'clearly express an intent to define the term.'" *Id.* (quoting *Thorner,* 669 F.3d at 1365). And "[t]o disavow the full scope of a claim term, the patentee's statements in the specification or prosecution history must

represent 'a clear disavowal of claim scope.'" *Id.* (quoting *Thorner,* 669 F.3d at 1366). "Accordingly, when 'an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable.'" *Id.* (quoting *3MInnovative Props. Co.* v. *Tredegar Corp.,* 725 F.3d 1315, 1326 (Fed. Cir. 2013)).

### B.    Indefiniteness

The Patent Act requires claims to particularly point out and distinctly claim the subject matter regarded as the inventions. 35 U.S.C. § 112, ¶ 2. To satisfy this requirement, the claim must be read in light of the intrinsic evidence to determine whether it informs one of skill in the art at the time of the invention "about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910-11 (2014). To establish that a claim is indefinite, a patent challenger must prove indefiniteness by clear and convincing evidence. *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017).

## II.    U.S. Patent No. 7,487,240 (Case No. 6:20-cv-00489)

### A.    Overview of the '240 Patent

The application that led to the issuance of the U.S. Patent No. 7,487,240 ("the '240 patent") was filed on April 8, 2004 and claims priority to a foreign application filed on April 15, 2003 (and hence pre-AIA statutes apply). The '240 patent generally "relates to communications network management and service provisioning, and in particular to methods and apparatus for centralized Internet Protocol/Multi-Protocol Label Switching connectivity verification in a communications network managed context ensuring adherence to service level agreements" '240 patent, 1:9–14.

B.     **Terms with Disputed Constructions**

1.     **"verifying connectivity in the network relating to at least Layer-2 and Layer-3 objects" (claims 1, 6, and 13)**

| WSOU's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | Indefinite under 35 U.S.C. § 112(b) |

2.     **"a given containment hierarchy" (claims 1, 6, and 13)**

| WSOU's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | Indefinite under 35 U.S.C. § 112(b) |

The disputed "verifying connectivity …" and "a given containment hierarchy" terms are both presumptively definite by statute. Each term, when read in light of the intrinsic evidence, presumptively informs one of skill in the art at the time of the invention "about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910−11 (2014). Independent claims 1, 6, and 13 are reproduced below with the terms ZTE contends are indefinite in yellow highlighting and the two terms ZTE contends lack written description / enablement (addressed in Sections II.B.3. and II.B.4 below) in blue highlighting:

1. A network management connectivity verification framework comprising:
   a connectivity verification server to perform unattended connectivity
      verification jobs; and
   a connectivity verification application to:
      define connectivity verification jobs capable of *verifying
         connectivity in the network relating to at least Layer-2
         and Layer-3 objects* within *a given containment hierarchy
         for the network*,
      control the connectivity verification server to perform the defined
         connectivity verification jobs, wherein the performing
         generates at least one of connectivity verification results,
      display the connectivity verification results,
      receive a *user-input specification* of a connectivity verification
         threshold,
      compare the connectivity verification results to the specified
         connectivity verification threshold,
      generate an alarm when the comparison shows that at least one of
         the connectivity verification results has reached the
         specified connectivity verification threshold,

3

identify Layer-2 and Layer-3 objects within *the containment hierarchy affected by the connectivity verification results* associated with the alarm, and
display the identified Layer-2 and Layer-3 objects.

6. A method implemented at least in part by a connectivity verification server for creating a network connectivity verification test, comprising the following steps:

defining a connectivity verification job capable of *verifying connectivity in the network relating to at least Layer-2 and Layer-3* objects within *a given containment hierarchy for the network*;

controlling the connectivity verification server to perform the connectivity verification job wherein the performing generates at least one of connectivity verification results;

displaying the connectivity verification results;

receiving a *user-input specification* of a connectivity verification threshold;

comparing the connectivity verification results to the specified connectivity verification threshold;

generating an alarm when the comparison shows that at least one of the connectivity verification results has reached the specified connectivity verification threshold;

identifying Layer-2 and Layer-3 objects within *the containment hierarchy affected by the connectivity verify cation results* associated with the alarm; and

displaying the identified Layer-2 and Layer-3 objects.

13. A method implemented at least in part by a connectivity verification server for performing a network connectivity verification test in a network management context comprising the following steps:

scheduling a connectivity verification process, the process capable of *verifying connectivity in the network relating to at least Layer-2 and Layer-3 objects* within a *given containment hierarchy for the network*;

receiving a *user-input specification* of a connectivity verification threshold;

performing the scheduled connectivity verification process to generate a connectivity verification result;

comparing the connectivity verification result with the user-specified connectivity verification threshold;

generating an alarm when the comparison shows that the connectivity verification result has reached the specified connectivity verification threshold;

identifying Layer-2 and Layer-3 objects within *the containment hierarchy affected by the connectivity verification result* associated with the alarm; and

4

displaying the identified Layer-2 and Layer-3 objects.

'240 patent, claim 1 (16:34−42); claim 6 (17:10-32); and claim 13 (18:10-30).[1]

For both of the yellow-highlighted terms that ZTE contends are indefinite, the burden rests with ZTE to overcome the presumption of definiteness by clear and convincing evidence. It is unclear how ZTE maintains it can possibly meet its burden here, given ZTE has waived any reliance on expert testimony to support its position. *See, e.g., Lecat's Ventriloscope v. MT Tool & Mfg.,* 351 F. Supp. 3d 1100, 1114 (N.D. Ill. 2018) (finding a "garden-variety theory of indefiniteness 'requires a determination whether those skilled in the art would understand what is claimed'"); *Spansion, Inc. v. Int'l Trade Comm'n*, 629 F.3d 1331, 1344 (Fed. Cir. 2010) (citation omitted) ("the Court [should] conclude[] that expert testimony is necessary here to meet the exacting burden of proof."); *Whirlpool Corp. v. Ozcan,* No. 2:15-CV-2103-JRG, 2016 WL 7474517, at *3 (E.D. Tex. Dec. 29, 2016) (rejecting indefiniteness contention and noting that the accused infringer only provided attorney arguments to support its position and no expert testimony).

ZTE also failed to provide any notice as to any indefiniteness theory for either of the two terms of the '240 patent ZTE purports to challenge.  ZTE's Invalidity Contentions merely provide a bulleted list of claim language which includes the above terms (among others).  ZTE's Invalidity Contentions (served Jan. 6, 2021) at 55 (**Ex. A**).  ZTE introduced its bulleted list with the following conclusory and ambiguous statement: "[b]ased on ZTE's present understanding of (and Plaintiff's apparent interpretation of) the Asserted Claims, the Asserted Claims of the '240 Patent below fail to satisfy the requirements of § 112, ¶ 2 because the claims fail to point out and distinctly claim the subject matter which the inventors regard as the alleged invention for the following terms[.]" *Id.* That single, conclusory statement is literally all that ZTE opted to disclose in connection with its present challenge of the "verifying connectivity in the network…" and "a given containment hierarchy" terms.  *See id.*

---

[1] Emphasis is added unless otherwise noted.

In the absence of any notice of the alleged basis for ZTE's indefiniteness position, WSOU is prejudiced in its ability to address the dispute over these terms in its opening brief.  ZTE should not be allowed to lie behind the log on this dispute (injected by ZTE alone) and then force WSOU to relegate its entire rebuttal argument to its reply only.  Because ZTE failed to provide **any** notice if its positions on indefiniteness, and in the absence of any expert testimony, the presumption stands unrebutted that the "characteristic" term, when read in light of the intrinsic evidence, informs one of skill in the art at the time of the invention "about the scope of the invention with reasonable certainty." *Nautilus*, 572 U.S. at 910−11.

Without speculating as to why ZTE contends the disputed terms are allegedly indefinite, WSOU submits that at least the following description of an example embodiment is relevant to the disputed terms:

> A connectivity verification application 502 makes use of a network map provided via an IP map application 504 and/or a Layer 2 map application 506 to enable selection 600 of displayed 602 source 102S and destination 102D network nodes from a group of managed network nodes tracked via a containment hierarchy 508 by a Managed Object Server (MOL) 511 of a Network Management System (NMS).
>
> The selected 600 source 102S and destination 104D network nodes are used in defining 604 a connectivity verification job. A schedule may also be defined 606 for the connectivity verification job, although once defined 604 the connectivity verification job may be dispatched 610 for execution immediately. Defining 604 of the connectivity verification job includes specifying connectivity verification parameters including the type and the number of connectivity verification tests to be performed, and optionally specifying thresholds 520 to be applied to connectivity verification results returned (as described herein below).

'240 patent, 7:59−8:2.

### 3. "user-input specification" (claims 1, 6, and 13)

| WSOU's Proposed Construction | Defendant's Proposed Construction |
| --- | --- |
| Plain and ordinary meaning | Lack of written description/enablement under 35 U.S.C. § 112(a) |

### 4. "the containment hierarchy affected by the connectivity verification result[]" (claims 1, 6, and 13)

| WSOU's Proposed Construction | Defendant's Proposed Construction |
| --- | --- |
| Plain and ordinary meaning | Lack of written description/enablement under 35 U.S.C. § 112(a) |

ZTE errs as a matter of law in asserting written description and enablement as issues properly raised during claim construction. They are not. As this Court instructed, "patent validity arguments like lack of enablement and lack of written description are not proper during claim construction proceedings." *USB Bridge Sols., LLC v. Buffalo Inc.*, 1-17-CV-001158-LY, 2020 WL 1906898, at *5 (W.D. Tex. Apr. 17, 2020) (citing *Evicam Int'l, Inc. v. Enf't Video, LLC*, 2016 WL 6470967, at *14 (E.D. Tex. Nov. 2, 2016) and *Phillips*, 415 F.3d at 1327 ("[W]e have certainly not endorsed a regime in which validity analysis is a regular component of claim construction.")). As this Court recognized, the Eastern District of Texas has provided similar instruction. *See*, *e.g.*, *id.*; *Blue Calypso, Inc. v. Groupon, Inc.*, 93 F. Supp. 3d 575, 598 (E.D. Tex. 2015) ("Because claim construction proceedings generally do not address written description challenges, Defendants' 'indefiniteness' argument is hereby expressly rejected.") (citing *Phillips*, 415 F.3d at 1327).

Even if it were proper here to address these written description and enablement disputes during claim construction (and it is not) WSOU is prejudiced in its ability to address these unripe disputes in its instant opening brief because (1) ZTE has failed to provide *any* notice as to why the above phrase allegedly fails to satisfy either the written description or enablement requirements and (2) ZTE—***the party with the burden***—has not offered what it contends would be the proper construction that allegedly would give rise to issues of written description or enablement. ZTE

should not be allowed to lie behind the log on these alleged yet unripe disputes and then force WSOU to relegate its entire rebuttal argument to a ***claim construction*** reply brief.

**III.    U.S. Patent No. 8,147,071 (Case No. 6:20-cv-00492)**

**A.    Overview of the '071 Patent**

The application that led to the issuance of the U.S. Patent No. 8,147,071 ("the '071 patent") was filed on April 29, 2009 (and hence pre-AIA statutes apply).  The '071 patent generally "relates to the field of projecting images and sensing movement, as well as associated methods, computer programs and apparatus." '071 patent, 1:6–8.

**B.     Terms with Disputed Constructions**

    1.     **"the processor" / "wherein the processor is configured to" (claims 1, 9, 13, and 14)[2]**

| WSOU's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | Indefinite under 35 U.S.C. § 112(b) |

    2.     **"movement signalling" / "receiv[ing] movement signalling associated with the movement of the projector" / "corresponding movement signalling" (claims 1, 9, 13, and 14)[3]**

| WSOU's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | Indefinite under 35 U.S.C. § 112(b) |

    3.     **"discriminate" / "discriminate a movement criterion" / "the processor is configured to discriminate a movement criterion" (claims 1, 13, 14)**

| WSOU's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | Indefinite under 35 U.S.C. § 112(b) |

    4.     **"provide associated image data signalling to project associated image data" (claims 1, 13, 14)**

| WSOU's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | Indefinite under 35 U.S.C. § 112(b) |

All terms in the above-listed groups are presumptively definite.[4] Each term, when read in

light of the intrinsic evidence, presumptively informs one of skill in the art at the time of the

---

[2]  Because ZTE has failed to provide notice of its indefiniteness theory, WSOU reserves the right to object to whether these two terms are properly grouped and/or whether they are "same or similar terms" to be ordered together per the Order Governing Procedures 3.2 (OGP 3.2). In particular, WSOU notes that one of the terms in Section III.B.3. is "the processor is configured to discriminate a movement criterion," which overlaps substantially with the term in Section III.B.3.

[3]  In its Invalidity Contentions, ZTE did not identify the term "movement signalling" by itself as indefinite under 35 U.S.C. §112(2).  *See* Invalidity Contentions at 60.  Accordingly, ZTE has not preserved its indefiniteness challenge on the standalone term "movement signalling."

[4] WSOU has addressed these four groups of terms in one section because ZTE has not provided any notice of its indefiniteness theory and to avoid repeating the same legal arguments that apply

invention "about the scope of the invention with reasonable certainty." *Nautilus*, 572 U.S. at 910−11. Independent claims 1, 13, and 14 are reproduced with the terms that ZTE contends emphasized:

1. A processor for providing image data signalling to a projector, the image data signalling representing an image to be projected by the projector, ***the processor*** comprising:

      an input to ***receive movement signalling associated with movement of the projector***; and

      an output configured to provide image data signalling to the projector, and wherein the processor is configured to provide image data signalling to the projector based on received ***movement signalling***, wherein the movement signalling provides an indication of one or more movement criterion of the projector, the movement criterion representing one or more of displacement and movement speed of the projector, and ***wherein the processor is configured*** to ***discriminate a movement criterion*** and to ***provide associated image data signalling to project associated image data.***

13. A method of providing image data signalling to a projector, the image data signalling representing an image to be projected by the projector, the method comprising:

      ***receiving movement signalling associated with movement of the projector***, and

      providing image data signalling to the projector based on received ***movement signalling***, wherein the movement signalling provides an indication of one or more movement criterion of the projector, the movement criterion representing one or more of displacement and movement speed of the projector, and ***wherein the processor is configured to discriminate a movement criterion*** and to ***provide associated image data signalling to project associated image data***.

14. A computer readable medium comprising computer program code configured to, when executed by one or more processors, cause an apparatus to perform at least:

      ***receiving movement signalling associated with movement of a projector***, and

---

to each term.  WSOU reserves the right to address each of these groups in separate sections in its Reply.

> providing image data signalling to the projector based on received ***movement signalling***, wherein the movement signalling provides an indication of one or more movement criterion of the projector, the movement criterion representing one or more of displacement and movement speed of the projector, and ***wherein the processor is configured to discriminate a movement criterion*** and to ***provide associated image data signalling to project associated image data***.

'071 patent, claim 1 (11:13−28) , claim 13 (12:22-34), claim 14 (12:35-48).

For all four groups of terms that ZTE contends are indefinite, the burden rests with ZTE to overcome the presumption of definiteness by clear and convincing evidence. It is unclear how ZTE maintains it can possibly meet its burden here, given ZTE has waived any reliance on expert testimony to support its position. *See, e.g., Lecat's Ventriloscope.,* 351 F. Supp. 3d at 1114; *Spansion*, 629 F.3d at 1344; *Whirlpool*, 2016 WL 7474517, at *3.

As with the terms in Section II.B.1 and II.B.2., ZTE also failed to provide any notice as to any indefiniteness theory for either of the two terms of the '240 patent ZTE purports to challenge. ZTE's Invalidity Contentions merely provide a bulleted list of claim language which includes the above terms (among others). ZTE's Invalidity Contentions dated Jan. 6, 2021, at 59-60 (**Ex. A**). As noted previously, ZTE introduced its bulleted list with the following conclusory and ambiguous statement: "[b]ased on ZTE's present understanding of (and Plaintiff's apparent interpretation of) the Asserted Claims, the Asserted Claims of the '929 Patent below fail to satisfy the requirements of § 112, ¶ 2 because the claims fail to point out and distinctly claim the subject matter which the inventors regard as the alleged invention for the following terms[.]" *Id.* That single, conclusory statement is literally all that ZTE opted to disclose in connection with its present challenge of the four groupings of terms at issue here.

In the absence of any notice of the alleged basis for ZTE's indefiniteness position, WSOU is prejudiced in its ability to address the dispute over these terms in its opening brief. ZTE should not be allowed to lie behind the log on this dispute (injected by ZTE alone) and then force WSOU to relegate its entire rebuttal argument to its reply only. Because ZTE failed to provide any notice

if its positions on indefiniteness, and in the absence of any expert testimony, the presumption stands unrebutted that the "characteristic" term, when read in light of the intrinsic evidence, informs one of skill in the art at the time of the invention "about the scope of the invention with reasonable certainty." *Nautilus*, 572 U.S. at 910−11.

Without speculating as to why ZTE contends the disputed terms are allegedly indefinite, WSOU submits that at least the following descriptions are relevant:

**"the processor" / "wherein the processor is configured to":**

> The processor 1 is an integrated circuit (specifically an Application Specific Integrated Circuit—ASIC) having an input 1a, an output 1b and a user interface connection1c. The input 1a is configured to be connected to the movement sensor 3 and to receive movement signalling that is provided by the movement sensor 3. The output 1b is configured to be connected to the projector 2 and to provide image data signalling as an output signal. The image data signalling represents an image or images to be projected by the projector 2. The interface connection1c is an input/output connection that is to be connected to the user interface 4. This is configured to allow the user interface 4 to configure the processor 1 in a user-desired way.
> The processor 1 also comprises further electrical input/output connections (not shown) that are configured to be connectable to a power Supply, memory for storing data (for images for example), user input/output such as a display or keypad etc (also not shown). It should be noted that whilst in this embodiment the processor 1 is an ASIC, it may also be a general purpose central processing unit (CPU) that is configured to be able to perform a variety of other tasks (for example, a CPU in a hand-portable electronic device such as a mobile telephone, PDA, or the like), or the configured functionality may be provided by a plurality of separate integrated circuits. A computer readable medium (memory device) may be connected to or provided within a CPU embodiment of the processor 1 with computer program code stored thereon for carrying out the method of the present invention.

'071 patent, 4:37−65.

**"movement signalling" / "receiv[ing] movement signalling associated with the movement of the projector" / "corresponding movement signalling":**

> The processor 1 is configured to have an association between directional movement of the apparatus 100 (via said received movement signalling) and movement between image data representing the images to be projected. By this it is meant that the processor 1 will provide image data signalling for the next or previous image in the image set upon receiving movement signalling associated with Such an instruction. In this embodiment, an abrupt movement of the apparatus to the right causes an incremental (i.e. one image at a time) or continuous (i.e. smooth scrolling

through the sequence of images) forward cycling through the image set whilst an abrupt movement of the apparatus to the left causes an incremental or continuous backward cycling through the image set (relative to the Figures). Repeated abrupt movements may provide for corresponding continuous scrolling through the set.

*Id.* at 6:66−7:14.

**"discriminate" / "discriminate a movement criterion" / "the processor is configured to discriminate a movement criterion":**

The user interface 4 is configured to be operable via the input/output area to control the configuration of the processor 1 via said connection 4c. By configuring the processor 1 to associate particular image data with a particular movement criterion represented/indicated by received movement signalling it is possible to tailor/customise the response of the processor 1 to respond in a particular way given a particular movement. This user interface 4 allows a user to customise the response of the processor 1.

\* \* \*

In this embodiment, the processor 1 is configured to have associations between image(s) and corresponding movement criterion. This provides for a corresponding link between a detected movement criterion representing physical movement of the projector and an image represented by image data signalling. This means that, upon detection of a given movement criterion, the processor 1 will provide the associated image data signalling to the projector 2 to project said image associated with the detected movement.

*Id.* at 5:34−43; 6:50-58.

 **"provide associated image data signalling to project associated image data":**

In this embodiment, the processor 1 is configured to have associations between image(s) and corresponding movement criterion. This provides for a corresponding link between a detected movement criterion representing physical movement of the projector and an image represented by image data signalling. This means that, upon detection of a given movement criterion, the processor 1 will provide the associated image data signalling to the projector 2 to project said image associated with the detected movement.

*Id.* at 6:50−58.

IV.    **U.S. Patent No. 9,258,232(Case No. 6:20-cv-00495)**

A.    **Overview of the '232 Patent**

The application that led to the issuance of the U.S. Patent No. 9,258,232 ("the '232 patent") was filed on January 27, 2012 and is a continuation of an application filed on October 18, 2007 (and hence pre-AIA statutes apply). The '232 patent generally "data packet communications systems, and in particular to controlling the flow of incoming data packets to data processing resources in such systems." '232 patent, 1:9-11. After acknowledging certain shortcomings in the existing technology, the '232 patent recognized that "there is a need to provide ingress traffic flow control that gives precedence to high-priority traffic over low-priority traffic while minimizing unutilized ingress bandwidth." *Id.* at 1:58-61.

B.    **Terms with Disputed Constructions**

1.    **"flow control" (claims 1)[5]**

| WSOU's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "regulate movement of a series of data packets" |

The term "flow control" should be accorded its plain-and-ordinary meaning and requires no construction for the following reasons.

*First*, the term "flow control" is a term of art. As noted, the plain and ordinary meaning of a term is the "meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Philips*, 415 F.3d at 1313. The term's status as a term of art is

---

[5] ZTE proposes grouping the term "flow control" with the term "instructions for execution by a traffic flow control system for performing flow control on a flow of data packets for transmission over a link." WSOU believes that ZTE's grouping violate OGP 3.2. While term "flow control" (which is recited separately in claim 1) is recited as part of the "instructions for execution …" term, the latter term is only recited in claim 14. Moreover, WSOU understands that ZTE pursues completely different theories for these terms. For "flow control" in method claim 1, ZTE proposes the definition above. For the "instructions for execution …" term in computer-readable-medium claim 14, ZTE claims that the term is subject to 35 U.S.C. §112(f) and indefinite. Accordingly, these two terms are not "same or similar terms" to be ordered together as required by OGP 3.2. If counted as two terms, ZTE would be beyond the limit authorized by the Court. *See* Email from R. Earle to Counsel of 02/26/21.

indicative by the specification's introduction of the term "flow control" without explaining what that term means. For instance, the term "flow control" first appears in the Title. *See* '232 patent at Title ("Ingress Traffic **Flow Control** in a Data Communications System"). The MPEP instructs Examiners that patent titles must be "brief but technically accurate and descriptive," and instructs Examiners to require the substation of a new title that is "clearly indicative of the invention to which the claims are directed." MPEP §§606, 606.01 (8th ed. Rev. 7 July 2008). The Examiner's acceptance of the term "flow control" in the title demonstrates that the term is both "technically accurate" and "clearly indicative." *See id.* Similarly, the term "flow control" is also recited in the first sentence of the Abstract. *See* '232 patent at Abstract. "The purpose of the abstract is to enable the United States Patent and Trademark Office and the public generally to determine quickly from a cursory inspection the nature and gist of the technical disclosure." 37 CFR §1.72. And an abstract should "sufficiently describe the disclosure to assist readers in deciding whether there is a need for consulting the full patent text for details." MPEP §608.01(b) (8th ed. Rev. 7 July 2008). The term is then used in the specification without any explanation of what that term means. *See, e.g.,* '232 patent at 1:15; 1:21-23; 1:46-48; 1:58-61; 1:66; 26-28; 3:7-9. Accordingly, the term "flow control" undoubtedly has a plain and ordinary meaning. The absence of any definition in the Title, Abstract, and specification is further indicative that a POSITA would understand a plain and ordinary meaning for "flow control." The Court need not construe this term.

**Second**, the surrounding claim language provides sufficient context for the term "flow control." Claim 1 recites "[a] method performed by a traffic **flow control** system for performing - **flow control** on a **flow of data packets for transmission over a link**." *Id.* at at claim 1 (6:7-9).

**Third**, ZTE's proposed construction is vague and unhelpful, and it should be rejected for improperly importing limitations not required in the claims or specification. *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1369 (Fed. Cir. 2012) ("Absent disclaimer or lexicography, the plain meaning of the claim controls."). It is unclear the effect of the limitations of "**regulate movement**" and "**series** of data packets" in ZTE's proposed construction. The Court should reject ZTE's attempt to redraft the claim language, particularly in a manner that would only introduce

ambiguity.

### 2.     "transmission over a link" (claims 1 & 14)

| WSOU's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | Indefinite under § 112(b) |

As with the prior terms that ZTE contends are indefinite (see Sections II.B.1—2 and III.B.1—4, above), the "transmission over a link" term is presumptively definite. Each term, when read in light of the intrinsic evidence, presumptively informs one of skill in the art at the time of the invention "about the scope of the invention with reasonable certainty." *Nautilus*, 572 U.S. at 910−11. As noted above, the burden rests with ZTE to overcome the presumption of definiteness by clear and convincing evidence. It is unclear how ZTE maintains it can possibly meet its burden here, given ZTE has waived any reliance on expert testimony to support its position. *See, e.g., Lecat's Ventriloscope.*, 351 F. Supp. 3d at 1114; *Spansion*, 629 F.3d at 1344; *Whirlpool*, 2016 WL 7474517, at *3.

As with the terms in Section II, ZTE also failed to provide any notice as to any indefiniteness theory for either of the two terms of the '240 patent ZTE purports to challenge. ZTE's Invalidity Contentions merely provide a bulleted list of claim language which includes the above terms (among others).  ZTE's Invalidity Contentions dated Jan. 6, 2021, at 59-60 (**Ex. A**). As noted previously, ZTE introduced its bulleted list with the following conclusory and ambiguous statement: "[b]ased on ZTE's present understanding of (and Plaintiff's apparent interpretation of) the Asserted Claims, the Asserted Claims of the '929 Patent below fail to satisfy the requirements of § 112, ¶ 2 because the claims fail to point out and distinctly claim the subject matter which the inventors regard as the alleged invention for the following terms[.]" *Id.* That single, conclusory statement is literally all that ZTE opted to disclose in connection with its present challenge of the four groupings of terms at issue here.

In the absence of any notice of the alleged basis for ZTE's indefiniteness position, WSOU is prejudiced in its ability to address the dispute over these terms in its opening brief.  ZTE should

not be allowed to lie behind the log on this dispute (injected by ZTE alone) and then force WSOU to relegate its entire rebuttal argument to its reply only.  Because ZTE failed to provide any notice if its positions on indefiniteness, and in the absence of any expert testimony, the presumption stands unrebutted that the "characteristic" term, when read in light of the intrinsic evidence, informs one of skill in the art at the time of the invention "about the scope of the invention with reasonable certainty." *Nautilus*, 572 U.S. at 910−11.

### 3.   "period of congestion" (claims 1 & 14)

| WSOU's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | Lack of written description under 35 U.S.C. §112(a) |

### 4.   "rate limiting" (claims 1 & 14)

| WSOU's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | Lack of written description under 35 U.S.C. §112(a) |

As with the terms in Section II.B.3. and II.B.4., ZTE errs as a matter of law in asserting written description as an issue properly raised during claim construction. They are not.  As this Court instructed, "patent validity arguments like lack of enablement and lack of written description are not proper during claim construction proceedings." *USB Bridge,* 2020 WL 1906898, at *5; *accord Phillips*, 415 F.3d at 1327 ("[W]e have certainly not endorsed a regime in which validity analysis is a regular component of claim construction.")).  As this Court recognized, the Eastern District of Texas has provided similar instruction.  *See*, *e.g.*, *id.*; *Blue Calypso*, 93 F. Supp. 3d at 598 ("Because claim construction proceedings generally do not address written description challenges, Defendants' 'indefiniteness' argument is hereby expressly rejected.") (citing *Phillips*, 415 F.3d at 1327).

Even if it were proper here to address these written description and enablement disputes during claim construction (and it is not), WSOU is prejudiced in its ability to address these unripe disputes in its instant opening brief because (1) ZTE has failed to provide *any* notice as to why the

above phrase allegedly fails to satisfy either the written description or enablement requirements and (2) ZTE—*the party with the burden*—has not offered what it contends would be the proper construction that allegedly would give rise to issues of written description or enablement. The Court should not condone ZTE's behavior.

5. **"instructions for execution by a traffic flow control system for performing flow control on a flow of data packets for transmission over a link" (claim 14)**

| WSOU's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | Governed by 35 U.S.C. § 112(f)<br><br>**Function:** execution by a traffic flow control system for performing flow control on a flow of data packets for transmission over a link<br><br>Indefinite under 35 U.S.C. § 112(b);<br><br>**Structure:** none disclosed. |

ZTE's erroneous means-plus-function construction of claim 14 runs afoul of several well-established claim construction canons.

*First*, lack of the word "means" in claims 13 and 25 raises a rebuttable presumption against applying Section 112, ¶ 6. *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015) (*en banc*). While the burden lies with ZTE to rebut the presumption, it failed to advance any argument or evidence in its Invalidity Contentions (or in its disclosure of extrinsic evidence) as allegedly rebutting, or even addressing, the presumption against applying Section 112, ¶ 6 to claim 14, where the claim lacks the word "means."

*Second*, ZTE overlooks claim terms that connote structure to a person of ordinary skill in the art. The Federal Circuit reasoning in *Zeroclick, LLC v. Apple Inc.*, 891 F. 3d 1003, 1007–09 (Fed. Cir. 2018) is instructive on this point. That opinion found the district court "legally erred by not giving effect to the unrebutted presumption against the application of § 112, ¶ 6," and that the district court's analysis was "couched in conclusory language" in concluding that "program" and "user interface code" were nonce words. Under *Zeroclick*, therefore, the words "program" and

"code" are not properly considered *per se* nonce words in the context of the computing arts.  Here, the claim language at issue is not purely functional, but rather recites specific structure that can perform respective tasks set forth in the body the claims.  *See Crossroads Sys., (Texas), Inc. v. Chaparral Network Storage, Inc.*, No. A 00 CA 217 SS, 2000 WL 35731852, at *4 (W.D. Tex. July 27, 2000) ("From a review of the claim language as a whole, the Court agrees with the plaintiff that the term 'supervisor unit' is not purely functional, but refers instead to a device that can perform the tasks specifically listed in the claim language of the '972 patent."); *see also Collaborative Agreements, LLC v. Adobe Systems Inc.*, Case No. A–14–CV–356–LY, 2015 WL 2250391, *12–*14 (W.D. Tex. 2015), *denying reconsideration after transfer*, Case No. 15-cv-03853-EMC, 2015 WL 7753293, *4–*8 (N.D. Cal. Dec. 2, 2015) (finding "code-segment" had sufficient structure to avoid being treated as a means-plus-function limitation). Claim 14 is directed to "***[a] non-transitory machine-readable storage medium*** encoded with ***instructions*** for execution by a traffic flow control system for performing flow control on a ***flow of data packets for transmission over a link***, the ***non-transitory machine-readable storage medium comprising***" instructions for performing the tasks recited.

  ***Third***, ZTE's untethered interpretation (that the challenged claim language invokes Section 112, ¶ 6 and fails to recite *any* structure) effectively seeks to undue decades of recognized patent law concerning *Beauregard* claims.  *In re Beauregard*, 53 F.3d 1583 (Fed. Cir. 1995).  United States patent law has long recognized a *Beauregard* claim as a patentable form of claiming a computer program, where the claim is directed to an article of manufacture—*e.g.*, a computer-readable medium on which are encoded, typically, instructions for carrying out a process.  *Id*. Here, the preamble of claim 14 recites "[a] ***non-transitory machine-readable storage medium*** encoded with instructions for execution by a traffic flow control system for performing flow control on a flow of ***data packets for transmission over a link***, the ***non-transitory machine-readable storage medium*** comprising." The preamble is followed in the body of the claim 14 by a listing of executable "instructions" portions (which itself connotes structure).  ZTE's attempt to recast claim 14 as somehow invoking Section 112, ¶ 6 is a radical departure of established law,

including authority of this district. For example, the Court found that "computer readable medium" was an article of manufacture and not a means-plus-function limitation. *Collaborative Agreements,* 2015 WL 2250391, *12–*14. The Court also observed (in that same opinion) that "systems claims [which] are essentially a method carried out on an apparatus by a computer-implemented software code contained on a storage device[,] as in the code-segment claims[,] [employ] a standard claiming technique that has been repeatedly upheld as definite." *Id.* (collecting cases).

Dated: March 12, 2021                           Respectfully submitted,

By:      */s/ Ryan Loveless*
                                                James L. Etheridge
                                                Texas Bar No. 24059147
                                                Ryan S. Loveless
                                                Texas Bar No. 24036997
                                                Brett A. Mangrum
                                                Texas Bar No. 24065671
                                                Travis L. Richins
                                                Texas Bar No. 24061296
                                                Jeffrey Huang
                                                Brian M. Koide
                                                Etheridge Law Group, PLLC
                                                2600 E. Southlake Blvd., Suite 120 / 324
                                                Southlake, TX 76092
                                                Tel.: (817) 470-7249
                                                Fax: (817) 887-5950
                                                Jim@EtheridgeLaw.com
                                                Ryan@EtheridgeLaw.com
                                                Brett@EtheridgeLaw.com
                                                Travis@EtheridgeLaw.com
                                                Jhuang@EtheridgeLaw.com
                                                Brian@EtheridgeLaw.com

                                                Mark D. Siegmund
                                                State Bar No. 24117055
                                                mark@waltfairpllc.com
                                                Law Firm of Walt, Fair PLLC.
                                                1508 North Valley Mills Drive
                                                Waco, Texas 76710
                                                Telephone: (254) 772-6400
                                                Facsimile: (254) 772-6432

                                                *Counsel for Plaintiff WSOU Investments, LLC*

## **CERTIFICATE OF SERVICE**

A true and correct copy of the foregoing instrument was served or delivered electronically via U.S. District Court [LIVE]- Document Filing System to all counsel of record on March 12, 2021.

                                                */s/ James L. Etheridge*
                                                James L. Etheridge