# EXHIBIT 14

```
              IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF TEXAS
                       WACO DIVISION


                                 .
WSOU INVESTMENTS, LLC,           .   Case Nos. 6:20-CV-00487-ADA-DTG
D/B/A/ BRAZOS LICENSING          .             6:20-CV-00488-ADA-DTG
AND DEVELOPMENT,                 .             6:20-CV-00489-ADA-DTG
                                 .             6:20-CV-00490-ADA-DTG
             Plaintiff,          .             6:20-CV-00491-ADA-DTG
        v.                       .             6:20-CV-00492-ADA-DTG
                                 .             6:20-CV-00493-ADA-DTG
                                 .             6:20-CV-00494-ADA-DTG
ZTE CORPORATION,                 .             6:20-CV-00495-ADA-DTG
ZTE (USA), INC.,                 .             6:20-CV-00496-ADA-DTG
ZTE (TX), INC.,                  .             6:20-CV-00497-ADA-DTG
AQUA LICENSING, LLC,             .
                                 .   **VIA ZOOM TELECONFERENCE**
                                 .
             Defendants.         .   Thursday, May 12, 2022
. . . . . . . . . . . . . . .    .   1:36 p.m.


                TRANSCRIPT OF DISCOVERY HEARING
            BEFORE HONORABLE DEREK T. GILLILAND
                UNITED STATES MAGISTRATE JUDGE




APPEARANCES ON NEXT PAGE.

Deputy Clerk:              Melissa Copp
                           U.S. District Court
                           800 Franklin Avenue, #140
                           Waco, Texas 76701


Transcription Company:     Liberty Transcripts
                           7306 Danwood Drive
                           Austin, Texas 78759
                           (847) 848-4907
                           www.libertytranscripts.com




Proceedings recorded by electronic sound recording, transcript
produced by transcription service.
```

2

APPEARANCES VIA ZOOM TELECONFERENCE:

For the Plaintiff:        Steckler Wayne Cherry & Love
                          By:  MARK D. SIEGMUND, ESQ.
                          8416 Old McGregor Road
                          Waco, Texas 76712

                          Kasowitz Benson & Torres, LLP
                          BY:  HEATHER S. KIM, ESQ.
                               DARCY L. JONES, ESQ.
                          333 Twin Dolphin Drive, Suite 200
                          Redwood Shores, California 94065

                          Kasowitz Benson & Torres, LLP
                          BY:  LEA DARTEVELLE ERHEL, ESQ.
                          1633 Broadway
                          New York, New York 10019

For the Defendant:        Finnegan, Henderson, Farabow, Garrett
                          & Dunner LLP,
                          BY:  BRADFORD CHRISTOPHER SCHULZ, ESQ.
                          1875 Explorer Street, Suite 800
                          Reston, Virginia 20190

                          Finnegan, Henderson, Farabow, Garrett
                          & Dunner LLP,
                          BY:  ALEXANDER "ZAN" NEWKIRK, ESQ.
                          901 New York Avenue, NW
                          Washington, DC 20001

<u>INDEX</u>

|                                          | <u>PAGE</u> |
| --- | --- |
| Case called                              | 4    |
| Court Rulings on Discovery Disputes      | 28   |
|                                          | 49   |
| End of Proceedings                       | 50   |
| Certificate of Transcriber               | 50   |

1              WACO, TEXAS, THURSDAY, MAY 12, 2022, 1:36 P.M.

2              THE COURT:  All right.  Good afternoon everybody.  I

3    understand we're here on a discovery dispute with two issues.

4    And so I'm going to ask Ms. Copp to call the case, please.

5              THE CLERK:  Yes, Your Honor.

6              Calling Case Number WA:20-CV-487, 488, 489, 490, 491,

7    492, 493, 494, 495, 496, and 497, styled WSOU Investments, LLC,

8    v. ZTE Corporation, *et al.*, called for a discovery hearing.

9              THE COURT:  All right.  Could I get an announcement

10   from plaintiff?

11             MR. SIEGMUND:  Good afternoon, Your Honor.  This is

12   Mark Siegmund with Steckler Wayne Cherry & Love for plaintiff

13   Brazos Licensing and Development.  With me today are my

14   colleagues, Heather Kim, Darcy Jones, and Lea Dartavelle.  And

15   Ms. Kim and Ms. Dartavelle will be the main speakers today,

16   Judge.

17             THE COURT:  Very good.  Well, it's good to see you,

18   Mr. Siegmund, Ms. Kim, Ms. Dartavelle.

19             MR. SIEGMUND:  Good to see you, too.

20             THE COURT:  And then could I get announcements from

21   Defendant?

22             MR. SCHULZ:  Yes, Your Honor.

23             This is Bradford Schulz from Finnegan Henderson on

24   behalf of ZTE Corporation.  I'll be doing the primary arguing

25   for ZTE Corporation, but also with me is Zan Newkirk.  And I'd

1  like to mention that this is my first time, I believe it's

2  Zan's first time, before you.  So it's an honor.

3          THE COURT:  Good deal.  Well, welcome, Mr. Schulz and

4  Zan.  Good to see you, Mr. Schulz.  I look forward to hearing

5  the argument.  I see Zan's name, so good to see both of you in

6  the court virtually at least today.

7          The first issue I guess it appears to be WSOU's

8  motion to compel regarding the 30(b)(6) depos.  I guess we'll

9  call it a motion to compel versus motion for protective order.

10  And so with that, why don't we start with the plaintiff.

11          MS. KIM:  Thank you, Your Honor.  I would like to

12  note for the Court that we may be sharing some confidential

13  documents.  I noticed a couple of public attendees, so right

14  before we go into that or disclose any of that, I'll just ask

15  them to step away.

16          THE COURT:  Okay.  Yeah, give us plenty of hearing.

17  We're on what's our public Zoom link for the hearing.  Just for

18  future reference, too, if we have a hearing and you think we

19  may get into confidential stuff, we have a separate closed link

20  that we can use where we have a little more control.

21          So this one, give us a heads up before you put up

22  anything confidential or get into something confidential, and

23  we'll see if we can somehow move people out of the Zoom link to

24  maintain confidentiality.  And if we don't, we'll figure out a

25  way around it if it even means reconvening on the private link.

1          MS. KIM:  Thank you, Your Honor.

2          Yes, our dispute chart, the first issue here is our

3  motion to compel ZTE to provide all 30(b)(6) designations and

4  tender its witnesses before the close of fact discovery which

5  is currently set for June 17th, so about a month from today.

6          Before I get into any sort of argument, Your Honor,

7  do you have any questions for me?

8          THE COURT:  I do not at this point.

9          MS. KIM:  Okay.  Well, in addition to our briefing,

10  we'd just like to make a couple of other notes.  We've been

11  asking ZTE for their dates and designations for the 30(b)(6)

12  notices we served on them since November, so it's been about

13  six months or so.  Originally, they had given us -- in their

14  responses to our 30(b)(6) notice, they would give us witnesses

15  and designations on all topics.

16          My understanding before my firm Kasowitz came on to

17  the case was there was going to be maybe one witness and then

18  maybe two witnesses.  As of last month, I think it was maybe

19  going to be five witnesses with one TBD.  Now it looks like

20  maybe four witnesses.  So the target of how many witnesses and

21  what their designations are keep shifting.  We still have no

22  designation for any of the marketing topics, for example.

23          It seems like we have hopefully solidified the

24  technical topics that we've served on ZTE.  So we're asking

25  Your Honor to please make ZTE serve their designations and

1  provide the identities of their witnesses in the next seven

2  days if possible.

3          These cases were filed in June 2020, so they've been

4  pending for almost two years.  Due to several venue fights

5  we've had, the latest of which was denied by the Federal

6  Circuit on ZTE's petition for writ of mandamus last week.  I

7  think in addition to that, ZTE seems to be trying to delay

8  these cases even further.  They contend that they've applied

9  for visas to be able to take these depositions.

10          I understand from ZTE's counsel's correspondence and

11  meet and confers that they're trying to go to Macau where they

12  allow remote depositions to prep and defender their witnesses

13  in person.  As you see in our briefing, Your Honor, there's no

14  requirement that counsel has to attend in person.  Since COVID

15  hit, everything's been done remotely.  Even this hearing, Your

16  Honor, is on a remote basis.  Markman hearings, there have even

17  been jury -- or trials, sorry, bench trials on remote basis.

18  So there's no need for counsel to be present.

19          We also want to note that the ZTE's cases that they

20  cite -- I think they cited about six of them or so -- first

21  off, the Inventus case held that depositions should proceed in

22  Macau and noted that in the last 13 years -- and this case

23  issued I think in 2020 or 2021 -- China has allowed only one

24  deposition to be taken and that's in 13 years.  And that

25  favored against requiring compliance with the Hague.

1          The <u>Antares</u> case, in that case, the court did not

2     hold that counsel cannot attend physically.  It only held that

3     the 30(b)(6) deposition at those particular depositions -- and

4     this was during the pandemic era, as well, that counsel could

5     attend physically with the witness, not that it had to.

6          And then the <u>Maxell</u> case, which issued out of this

7     Court before Judge Albright last year, in that case, that dealt

8     with jurisdictional discovery and documentary discovery, to be

9     exact -- not deposition discovery.  And I'd like to note that

10    none of the other ZTE cases deal with China and then the cases

11    that even ZTE cites in support of having us go through the

12    Hague to have the depositions of its 30(b)(6) witnesses, none

13    of those cases held that compliance with the Hague is necessary

14    or required.

15         We really do appreciate ZTE trying to get these

16    depositions scheduled.  I understand the undertaking with

17    having to have the witnesses come up to Macau, which I think is

18    about an hour or two train ride from where they are in China.

19    And with that, we understand that it takes about 60 days.  With

20    fact discovery closing in the next month, we are agreeable to

21    extending that date out a little bit so that we can get the

22    discovery complete that we need.

23         There are also a few other discovery items you'll

24    hear about later today from my colleague Lea on documents and

25    rog requests which, of course, we would like to have those in

1  hand before the depositions proceed, as well.

2          Just a couple of other notes, Your Honor, one of them

3  being the time allotted for these depositions.  All of them

4  will be translated.  I'm sure Your Honor has in your practice

5  dealt with translated depositions.  They take a really long

6  time compared to just being able to speak and have a regular

7  deposition.  So we were asking for a 50 percent increase in the

8  seven-hour allotment per witness, which is standard under the

9  federal rules.  So a seven-hour deposition would be -- plus 50

10 percent would be 10-1/2 hours.

11          So we're asking ZTE to also make their witnesses

12 available on two consecutive days so that it is not so

13 exhausting for all involved to sit there for -- with breaks and

14 lunch a potentially 13- to 14-hour day.

15          THE COURT:  Okay.  Let me ask you, Ms. Kim, did --

16 have you gotten any of the depositions of anybody up to this

17 point?

18          MS. KIM:  No, Your Honor.  Not a single one.

19          THE COURT:  Okay.  And so without the depositions, I

20 guess, there's no way to be prepared to try the cases?

21          MS. KIM:  Not that I'm aware of, Your Honor.  I don't

22 think I could, no.

23          THE COURT:  Okay.  Let me hear from ZTE on this.

24          MR. SCHULZ:  Right, Your Honor.

25          So the issues really come down to three main points

10

1  and all along we've been pushing for.  We've been trying to

2  schedule these depositions through the federal and civil

3  procedure, but there seems to be a dynamic whether this should

4  proceed through the Federal Rules of Civil Procedure or through

5  the Hague Convention.

6          And the benefits of the Hague Convention, they help

7  balance these three issues that I'm about to go into.  So the

8  three issues are the legality of taking depositions without

9  authority of the Hague or the China Authority, whether that's

10 in China, Macau, or Hong Kong.  So the Hague helps balance

11 that.

12          The second point is the COVID's travel restrictions.

13 So I believe Heather has mentioned a few other cases, but the

14 facts here are a little bit different based off of where our

15 witnesses have to travel from.  So our witnesses are having to

16 travel from the two main cities that are at issue are Shanghai

17 and Xi'an.

18          Your Honor, you might be familiar with Shanghai.

19 It's completely locked down.  You might have seen videos of the

20 citizens there.  They're singing out of their balconies and the

21 police forces are telling them to go inside.  You might see

22 droned footage of drones flying by telling the citizens to go

23 inside.  So they're even struggling just to get day-to-day

24 supplies, food, let alone they're not going to be able to

25 travel to Macau or Hong Kong.

1           So that's one issue is the actual travel issue.  From

2   Shanghai, that's either traveling to Macau or back.  And then

3   we have a similar issue for Xi'an, the City of Xi'an, where the

4   witnesses from Xi'an will have to quarantine to get into Macau

5   for a few days.  But more importantly, when they travel back to

6   Xi'an, they have to quarantine for at least 14 days.

7           In a lot of instances, this quarantining occurs in a

8   government hotel which has somewhat maybe adequate

9   infrastructure, but the main concern is it doesn't have

10  internet in the infrastructure.  So Brazos is effectively

11  asking our witnesses to sit in quarantine without internet for

12  possibly two-plus weeks where they aren't able to perform their

13  normal business activities.

14          So that's two weeks where these individuals and their

15  various technical groups are out completely not doing any

16  business.  Likely they will have minimum contact with the rest

17  of the ZTE Corporation.  So those are some of the travel

18  restrictions just for the witnesses.  And then we also have

19  some travel issues for getting our counsel team to these

20  witnesses to help prep them and also prepare them and be there

21  present for the deposition.

22          My colleague across the aisle, Heather, mentioned

23  that there's a language transition -- translation and language

24  barrier.  Well, that also complicates the deposition

25  preparation and deposition defense which is why we typically

12

1 like to have our counsel team there to help in the preparation

2 to help field any of these translation issues, and then also to

3 be present for the deposition.

4        In our experience, this usually goes well in Hong

5 Kong.  Because right now, with the COVID restrictions, Hong

6 Kong isn't an option and in some instances, Macau is not even

7 an option because the witnesses can't get out of Shanghai.

8        And then the third issue is the recent September 2021

9 data security law that hinders transferring documents from

10 China because that hinders the whole remote deposition

11 preparation and the remote deposition process itself,

12 especially if our counsel team's not there in China and the

13 documents have to be transmitted.

14        So for that particular case, as Heather indicated,

15 Judge Albright already ruled in the <u>Maxell</u> case to extend

16 discovery based on that issue alone, just for the parties to

17 handle and navigate through the data security law, the

18 September 2021 data security law.

19        So all these three issues, we believe, weigh in favor

20 of proceeding through the Hague Convention because the Hague

21 Convention and the China Authority can help balance all of

22 these three issues.  And on top of that, so that's just really

23 one factor in the seven-factor analysis that we put in our

24 brief.  And this is based off the Supreme Court case from

25 <u>Aerospatiale</u> that had five factors, and then Texas courts have

13

1  adopted two more factors.

2          I'm willing to go through those factors one by one,
3  Your Honor.  We briefly addressed them in our dispute chart.
4  It's kind of the point where it's not really sufficient to
5  brief these in 500 or 1,000 words, so we do maintain that if
6  Your Honor would care to have more arguments, that it would be
7  appropriate to have full motion to compel briefing, if that's
8  the way we're styling this current discovery dispute, just
9  because the text of each factor alone is almost 100 or some
10 words.

11         But I'm willing to go through each factor right now
12 if you have any questions.  Otherwise, I can -- it sounds like
13 you do have -- it looks like you have a question.

14         THE COURT:  Well, I've got some questions.  I've seen
15 the factors.  I agree that it's one of those issues that it's
16 hard to condense to 500 words.  But let me kind of take this
17 bite size, at least, for the time being.

18         It seemed like plaintiffs' first point and request
19 today was an order requiring ZTE to designate -- identify and
20 designate its witnesses on topics within the next seven days.
21 That seems like an easy issue to resolve today.

22         MR. SCHULZ:  Right.  So, Your Honor, we've designated
23 -- and the reason it's gone back and forth is because of the
24 scheduling.   But right now, the three witnesses we have
25 designated are the technical witnesses.

1          As far as the sales and marketing, I believe it's one
2    of the next topics, but the sales and marketing is exclusively
3    done out of ZTE USA, which is a non-party to this suit.  So the
4    depositions for ZTE USA would be better suited for a subpoena.
5    And ZTE USA is based in the Northern District of Texas.  So
6    that was part of the venue jurisdictional issues.

7          ZTE USA was formerly part of this case, but Judge
8    Albright dismissed them from this venue.  So any such discovery
9    should proceed in the Northern District of Texas where there is
10   a parallel suit pending.  Because they're a non-party, the
11   proper means for discovery for ZTE USA would be through a
12   subpoena, a Rule 45 subpoena.

13         So we designated the technical witnesses.  And then
14   there are some topics that we believe are not relevant.  I
15   believe I identified those as Topics 1 through 16 that pertain
16   to ZTE Corporation's IP licensing and monetization, which as
17   far as we can tell, it's not related to any of the grounds, any
18   of the claims, any of the defenses, any of the patents.  It's
19   for years 2021 to 2025, so it has -- it doesn't even pertain to
20   the hypothetical negotiation or any of the Georgia-Pacific
21   factors.

22         So as far as we can tell, those topics aren't
23   related, and it doesn't -- we're willing if the Court wants us
24   to designate a witness just to say that these are not relevant
25   for the cases.  We're willing to do that.  Just keep in mind

1  that we still have all those travel restrictions, so it would

2  be unduly burdensome just to have a witness come to Macau to

3  say that these topics are not relevant to the case because they

4  don't pertain to any of the damages theories.  They don't

5  pertain to any of the patents, any of the products themselves.

6         So those are kind of like the three buckets.  We have

7  the technology folks, which we have designated.  Then there's

8  the sales and marketing folks, which we are directing Brazos to

9  go to ZTE USA for.  And then there's this leftover kind of IP

10 monetization group, which we've maintained is not relevant to

11 these cases.

12        THE COURT:  Okay.  And let me address each of those

13 buckets.  And it seems to me, you know, relevance is not an

14 issue for a witness.  So it could be an issue for an objection

15 that the Court would then need to address.  So I would say if

16 there are topics you think are irrelevant, then -- and you

17 refuse to provide a witness on, you know, I think that's the

18 appropriate way to handle it.  And then Ms. Kim can decide

19 whether she agrees or disagrees.  And then y'all can bring that

20 to me to resolve as to whether or not it is relevant and you

21 need to put up a witness.

22        And I would say probably the same for ZTE USA.  You

23 know, if you just say, look -- and maybe it's not a relevance

24 issue, but you say -- and I'm not sure the legal entity that

25 you've got, but the ZTE entity in this case, yeah, just tell

1  Ms. Kim whether or not you're going to put somebody up and why

2  or why not.

3           So if it's on the sales stuff, I could see based on

4  what you said that it may be a situation where ZTE, the party,

5  has no information and so will not be putting up a witness.

6  And then go see ZTE USA, and then we can discuss that issue.

7           Tell me does -- what's the name of the ZTE party

8  that's in this lawsuit, the entity?

9           MR. SCHULZ:  It's ZTE Corporation, Your Honor.

10           THE COURT:  Corporation, okay.

11           And I assume they're a U.S. corporation of some

12  state?

13           MR. SCHULZ:  ZTE Corporation is the Chinese entity.

14  ZTE USA is incorporated -- well, is a resident of Richardson,

15  Texas in the Northern District of Texas.  So ZTE USA is the

16  domestic entity in Richardson, Texas.

17           THE COURT:  Okay.

18           MR. SCHULZ:  And then ZTE USA is the -- I want to say

19  they're -- I don't recall off the top of my head which city in

20  China they're based out of, where they're headquartered.

21           THE COURT:  Okay.  So ZTE Corp is a foreign entity?

22           MR. SCHULZ:  Correct.

23           THE COURT:  Okay.

24           You know, and the only thing that strikes me is if

25  ZTE Corp has control over ZTE USA to the extent that they could

1   require an employee to appear, that's a question that i have.

2          MR. SCHULZ:  So that's actually one of the later

3   topics, Your Honor.  So there's actually -- I'm going to

4   probably butcher this name -- it's the Gerling case out of the

5   Third Circuit where it analyzes whether the parent has

6   sufficient control over the subsidiary.

7          And first of all, Your Honor, we've already addressed

8   this in the venue briefing, so it was already established that

9   there wasn't sufficient control between the entities.  So that

10  already was part of the venue briefing.

11         And then, second, we've actually established that the

12  two Gerling factors, and neither have been addressed by

13  plaintiff Brazos here.  So they haven't established that there

14  is sufficient control.  In our position, there isn't sufficient

15  control, but they haven't made that case yet or they haven't

16  made that argument.

17         THE COURT:  Okay.

18         MR. SCHULZ:  And I believe that that might be part of

19  the second dispute chart, Your Honor.

20         THE COURT:  Okay.  Well, let me --

21         MR. SCHULZ:  For today.

22         THE COURT:  So going back to the -- at least on the

23  topics, I would like for ZTE to at least identify -- you know,

24  tell WSOU whether or not they're going to provide a witness on

25  each topic and then the basis for why or why not.  And then we

18

1  can address each of those.  You know, Ms. Kim can decide which,

2  if any, of those are worth bringing back to the Court's

3  attention and we can address them.

4          I think I know the basis for, you know, whether

5  you're going to get witnesses on licensing issues or sales

6  data.  But let's say we'll do that.  I'll order you to provide

7  those designations within seven days and just so she knows what

8  you're going to give her a witness on and what you're not going

9  to give her a witness on.  And if you're not going to give her

10 a witness on it, the basis for why not.  And that we can do

11 without getting into  the Hague issues.

12         What about when these technical depositions go or

13 depositions of I'm assuming Chinese nationals, if they go --

14 obviously, going to be through translation -- what about the

15 50-percent increase on depo time strikes me as pretty

16 reasonable?

17         MR. SCHULZ:  So we proposed 10 hours, and I believe

18 the 50 percent comes out because it's normally 7 hours.  So the

19 50 percent comes out to 10-1/2.  So we said 10 hours.  And

20 we're not -- it's not a hard cutoff.  We just -- that seemed

21 like the round number.  We're willing to go further.  It's just

22 10 hours was what we normally do for our depositions in Hong

23 Kong for previous depositions with Chinese nationals.

24         THE COURT:  Okay.  Well, what I'll do -- I'll give

25 the plaintiffs the benefit of the doubt on that one.  We'll say

1   10-1/2.  It's just 30 minutes.  If they get in there and you

2   think there's a lot of time being wasted after the first one

3   occurs, you know, you can bring that to my attention.

4         Similarly, Ms. Kim, if you get in there and if for

5   some reason or another, that's not sufficient time, you can

6   bring that to my attention and we can adjust.

7         All right.  Now to the really tough question on these

8   30(b)(6)s is what to do with the witnesses.  So are there any

9   ZTE Corp employees stateside?

10        MR. SCHULZ:  No, Your Honor.  Not that would be for

11   these depositions.  So we're focusing on the folks that have

12   the technology understanding.  And honestly, I don't believe

13   they even have anyone stateside.  So -- but we've investigated

14   where the witnesses are based on the technology topics and the

15   topics in general.  And our understanding is they're all based

16   in China.

17        There are a few instances where there might be

18   somebody in Europe, and we've been investigating that too, as

19   well.  But at this point, the European individuals won't have

20   much to provide, and they're for different entities, as well.

21   So most of the people with the knowledge that we've been

22   relying on for collecting documents and I believe that pertains

23   to some of the later topics for the interrogatories.  A lot of

24   those folks are based in China.

25        THE COURT:  Okay.  And assuming that the plaintiff

1   has to proceed under the Hague on the depositions, do you have

2   any estimation of how long that would take before the witnesses

3   could be deposed?

4           MR. SCHULZ:  Off the top of my head, I do not have an

5   estimation.  Honestly, it's more likely that the COVID might --

6   the COVID restrictions might pass before then.  But either way,

7   the benefit of the Hague Convention is we work with the China

8   Authority.  So the China Authority can also help us with those

9   restrictions.  And if they find that there might be an

10  alternative of going to Macau and they can work on some of the

11  COVID restrictions and kind of expedite the process, that's the

12  benefit of working through the Hague is to get the China

13  Authority backing on a lot of these issues.  It's kind of like

14  the streamline.

15          THE COURT:  Okay.

16          MR. SCHULZ:  So it might not be a deposition in China

17  that might take the longer -- that might take longer through

18  the Hague process.  But still having the China Authority

19  assistance might help us streamline either Hong Kong and Macau.

20          THE COURT:  So like working with the Chinese

21  Authorities, has that process already begun?

22          MR. SCHULZ:  Your Honor, as far as we know, the

23  plaintiff is the one who has to initiate that process, and

24  we've been mentioning -- and this, I believe Heather mentioned

25  the deposition notices went out in November.  So it's been

21

1   about roughly six months that we've asked them to proceed

2   through the Hague Convention.  So I defer to the plaintiff on

3   whether they've actually proceeded through the Hague process.

4          And that's actually one of the factors.  That's

5   factor seven whether the plaintiff has actually attempted the

6   Hague process at all.  So if they haven't, then that factor

7   weighs in favor of proceeding with the Hague if they haven't

8   even tried.

9          THE COURT:  Okay.  And this may be a better question

10  for plaintiff, too, but do you have any idea from prior

11  experience how long it would take to go through the Hague

12  process with China to get a deposition?  I mean what kind of

13  delay are we looking at?  I know service of process through the

14  Hague sometimes can take months and, in China, I would expect

15  even longer.

16         MS. KIM:  Your Honor, we have not initiated Hague

17  proceedings.  Hague proceedings have not been required for

18  depositions in Judge Albright's court before.  As I noted

19  earlier today, none of the cases even ZTE cites in support for

20  complying with the Hague held that Hague compliance was

21  required.  In fact, one of the cases noted that one defendant

22  did go -- of all the cases that went through in 13 years, it

23  was only allowed once.

24         So even if we were able to go through the Hague

25  quickly, I would imagine it's not a quick process.  But even if

22

1  it was quick, there's a 99.9 percent chance that we would be in

2  the same position because they wouldn't let it go forward

3  anyway.  And I can share that with you on my screen, Your

4  Honor.  This is the case that ZTE had cited.  It is the

5  Invectus Power [sic] case that issued in 2021 so just last

6  year.

7        And that's why the Court here in its discretion

8  ordered the parties to take the deposition of this Chinese

9  national in Macau and noted that in the more than 30 years,

10 under the Consular Convention and 13 years under the Hague,

11 China has granted permission for a deposition on only one

12 occasion.  And they also noted here, number one, the Hague

13 proceedings will be delayed for approximately seven months or

14 more due to COVID backlog.

15       So we're looking at at least seven months here with

16 the very, very high likelihood that we would be in the same

17 position we are here today.

18       THE COURT:  Okay.

19       MS. KIM:  I'd also like to note, Your Honor, that we

20 have another case that we represent WSOU on.  It's against

21 OnePlus which is another foreign entity in China.  And they

22 have made their witnesses available in Macau.  They first

23 offered in January, then in April, then this month, then July.

24 And they have not needed to have 60 days.  I understand they're

25 also coming from Shenzhen, China, which is probably different

23

than Shanghai.  But I don't imagine it being that drastically

different.

        And OnePlus there, we -- they also had given us sales

and marketing depositions on a 30(b)(6) basis of their U.S.

entity, as well, their subsidiary.

        THE COURT:  Okay.

        MR. SCHULZ:  Your Honor, if I may, on that last

point?

        THE COURT:  Yeah.  Let me real quick.  Ms. Kim, what

was that case again?  That's WSOU versus who?

        MS. KIM:  OnePlus.

        THE COURT:  OnePlus, okay.

        MS. KIM:  Yes, Your Honor.

        THE COURT:  Go ahead, Mr. Schulz.

        MR. SCHULZ:  So during our last meet and confer with

plaintiff, they invited us to reach out to OnePlus to determine

how they're proceeding with their deposition.  So we reached

out to counsel for OnePlus, and they indicated that the

witnesses for OnePlus aren't coming from the same city as the

ZTE Corporation witnesses are coming from.  So they don't have

the same issues that I mentioned for Shanghai.

        Like I said, Shanghai, there's no travel at all to,

from.  They can't go to Macau.  They can't come home.  And then

Xi'an, they can go to Macau.  They'll have to quarantine in

Macau for a couple of days, and then the main issue is when

1  they return back to Xi'an is that those weeks of quarantining

2  in Xi'an with -- in the government facility.

3         So our understanding is they don't -- OnePlus doesn't

4  have those same issues.  And as Heather indicated, they've

5  tried to coordinate and schedule these depositions three or

6  four times already, and they have something scheduled.  It's

7  just -- it keeps getting pushed back.  So it has yet to be

8  determined whether OnePlus actually is able to tender its

9  witnesses under the protocols that -- in Macau based off of

10 whatever keeps pushing these depositions.

11        And then, thirdly, I believe Heather indicated that

12 OnePlus was permitting discovery over its domestic entity.  I

13 don't know the procedural posture for the domestic entity for

14 OnePlus.  I don't know if venue is appropriate, at least for

15 these cases.  I do know that this Court has already determined

16 that venue is not appropriate for ZTE USA.

17        So it would be -- in our opinion, we're willing to go

18 in further for those later issues.  It would be improper to

19 circumvent the Federal Rules of Civil Procedure, primarily the

20 subpoena process, for non-parties by seeking discovery over ZTE

21 USA when the venue -- when it missed venue here in the Western

22 District of Texas.

23        MS. KIM:  Your Honor, if I may note, our

24 understanding --

25        THE COURT:  Go ahead, Ms. Kim.

25

1          MS. KIM:   Sure.

2          If I may note, I understand that the OnePlus entity,

3   the U.S. entity, is a wholly-owned subsidiary of the Chinese

4   entity, and that's the same here.   ZTE USA is a wholly-owned

5   subsidiary of ZTE Corp in China.

6          THE COURT:   Okay.   And in WSOU's case against

7   OnePlus, did it require court intervention or did OnePlus

8   voluntarily --

9          MS. KIM:   OnePlus voluntarily did so, Your Honor.

10  And we didn't sue OnePlus USA, either.   It's always been just

11  the Chinese entity, and we didn't have any dispute on that.

12  They voluntarily did that.

13          MR. SCHULZ:   And if I may, Your Honor, the wholly-

14  owned component is not the -- it's the end-all for the

15  analysis.   Like I said, the _Gerling_ goes into two factors

16  whether ZTE Corporation has control over the power and the

17  board of ZTE USA.   That's one factor.   That's not the case

18  here.   And even still, plaintiff has not made that argument.

19          And then the next one is if the two businesses are so

20  entwined for the particular process.   And, again, that's not

21  the case here.   And still, plaintiff has not made that

22  argument.   And on top of that, we've had similar arguments in

23  the venue briefing, and it was found that these were two

24  separate entities.   And that's why ZTE USA and another

25  subsidiary were dismissed form this case.

1          But -- so the Court has already recognized that the

2   two parties are separate and there was a severance.

3          THE COURT:  And that's why I was curious.

4          Ms. Kim, do you agree, I guess, for purposes of the

5   venue ruling that the Court's recognized a distinction, a lack

6   of control of ZTE USA by ZTE Corp?

7          MS. KIM:  Your Honor, I don't know if I'm prepared to

8   answer that.  I was not involved in the original venue

9   briefing.  Maybe Mr. Siegmund knows.  But our firm came on

10  afterwards.  We only handled the writ of mandamus briefing,

11  which was recently denied.

12         MR. SIEGMUND:  And, Judge, just briefly, we didn't

13  really make that argument in the venue briefing.  We just tried

14  to show that ZTE USA had a regular and established place of

15  business in this district.  And Mr. Schulz is correct that we

16  did not win that fight, but we did not try to show somehow that

17  the corporate severance is for nothing because I don't really

18  know what that would get us.

19         ZTE Corporation is a foreign entity, so venue was

20  always proper.  So really the battle was us just trying to

21  establish if ZTE Texas and ZTE USA had a regular and

22  established place of business, and we were not successful in

23  that.  And so they were transferred to the Northern District of

24  Texas.  But we did not try to make a -- I guess you could call

25  it a veil-piercing argument.  We did not make that during our

27

1    venue briefing.

2           THE COURT:  Okay.

3           MR. SCHULZ:  If I may, Your Honor?

4           THE COURT:  Go ahead, Mr. Schulz.

5           MR. SCHULZ:  So that's not exactly clear cut because

6    there was some sort of legal odd question of whether the

7    plaintiff was seeking venue under 1391 even for the domestic

8    entity.  So there was kind of a play of how 1391, 1400, the two

9    venue statutes apply to the various entities.

10          Throughout the discovery, the venue discovery, and

11   the subsequent depositions for venue, there was an interplay of

12   how the two entities interacted with each other, where the

13   offices were located, how the employees interacted with each

14   other.  So they did dive into this evidentiary component of how

15   -- whether the two entities are intermingled because their

16   legal theories for venue were both 1391 and 1400 for both

17   entities.  They didn't separate the legal theories, 1400 for

18   domestic and 1391 for the foreign.

19          So they were applying both statutes, and they were

20   trying to intermingle or at least make a case for mingling,

21   that the two entities were mingled.

22          THE COURT:  Okay.

23          MS. KIM:  Your Honor, if I may just note the standard

24   -- what I think Mr. Schulz is pointing at here for piercing the

25   veil or the commingling is lower for discovery than it is for

1   venue.  I understand it was not raised in venue.  The writ of

2   mandamus I'm referring to has to do -- refers to file rule.

3   That was recently denied against ZTE, but the standard, as Your

4   Honor probably is already aware more than I am, is that it is

5   lower for discovery than it is for venue (indiscernible).

6           THE COURT:  Okay.  Yeah.  So at least as far as the

7   control of ZTE USA by ZTE Corp, I think that's probably a

8   better issue to take up once you get full statements on

9   witnesses that will be -- topics the witness will be produced

10  on versus a witness not produced on.  And then we can -- you

11  know, that could be a discrete, you know, email dispute, the

12  500-page or 500-word chart.

13          Let me go off the record just for a minute to

14  consider the Hague versus compelling, you know, a witness to

15  travel issue because that's a little trickier, especially right

16  now.

17          So we're going to go off the record just briefly.

18      (Off-the-record bench conference between Court and Law

19  Clerk from 2:09 p.m. to 2:15 p.m.)

20          THE COURT:  Okay.  So here's what we're going to do

21  with regard to this.  I would -- I normally don't like to do

22  this.  Normally I like to give you an answer on the spot, but

23  I'm not going to give you an answer on the spot today.  What I

24  am going to do is I'm going to ask for briefing on a tight

25  schedule.  And unless -- you know, if you want an answer

1  quicker, unfortunately, this is going to put the plaintiffs

2  working over the weekend.  But if I could get five pages from

3  plaintiff about why we should order it, order the witnesses to

4  move and legal authority for doing so versus making the

5  plaintiff go through the Hague.

6          If I could get five pages from plaintiff on Monday,

7  and then defendant provide me a five-page response on Thursday,

8  May -- I'm sorry, a five-page response on Friday because this

9  way it will give -- I'm not counting the weekends,

10 unfortunately -- or I am counting the days over the weekend,

11 excuse me.

12         That will give plaintiff four days to write their

13 five-page brief and then give defendants four days to respond.

14 So plaintiff's five pages due on May 16, defendants' response

15 due May 20.  And then three days to get a three-page reply from

16 plaintiff on May 23.  And we'll call it quits at that point on

17 the issue of the Hague versus the Federal Rules of Civil

18 Procedure.  And then I'll get you an answer on that as quickly

19 as possible.

20         I will tell you -- when is fact discovery currently

21 set to conclude?

22         MS. KIM:  June 17th, Your Honor.

23         THE COURT:  Okay.  Yeah, obviously, I'm afraid that's

24 going to have to slide.  So I'll give you a warning about that

25 because overriding all of this, of course, is the concerns

1  about the Shanghai lockdown are not lost on me.  And so we're

2  going to try and accommodate that regardless of how the issue

3  comes out.  But then how much it has to slide will depend in

4  part on the Shanghai lockdown and in part on whether I decide

5  you need to go through the Hague or defendant needs to move

6  their witnesses to Macau for depositions.

7          Okay.  So is that clear on the briefing schedule?

8          MS. KIM:  Yes, Your Honor.

9          I did have a follow-up question.  I understand from

10  ZTE's counsel that they have applied to have their witnesses go

11  to Macau already.  Could they produce those applications to the

12  Court and to us so we can see how far along they are in the

13  process?  I understand that was done quite some time ago, so

14  they should be issuing, I would imagine pretty soon, the

15  witnesses that have now gotten permission to go to Macau

16  already.  And that would factor into our briefing, obviously.

17          THE COURT:  Gotcha.

18          Mr. Schulz?

19          MR. SCHULZ:  So we said we started the process is

20  what we represented.  So that was also for the counsel team,

21  the Finnegan team as well as the witnesses.  So we started the

22  process.  We call up the local authorities and say, hey, what's

23  the process, can we get this done in three days, the three days

24  quarantine.  The local authorities tell us no, we got another

25  spike.  And that's just kind of happened every single month.

1          And then on top of that, the witnesses were doing the

2    same thing on their end.  So if you want, we can provide that,

3    hey, we called up the local authorities, we have the websites,

4    we can do that if that is what the plaintiff is looking for.

5          THE COURT:  Yeah.  I don't know what these things

6    look like, whether it's a web app that you fill out or a form

7    that somebody would have a copy of.  Do either of y'all know?

8          MR. SCHULZ:  Well, like I said, for the witness on

9    the U.S. side, so it's a combination of not only do we have to

10   coordinate with the U.S. government but then also on the local

11   cities.  So it's kind of like a two-fold.  You have to call two

12   different groups.

13          On the Chinese side, I can get some more information

14   from them, but obviously I don't think they have to deal with

15   the U.S. government on the Chinese side.

16          But, yes, I do believe there is some kind of you call

17   and then they'd call back and then it proceeds -- if it is even

18   possible, it will proceed to a formal paper at some stage.  But

19   a lot of these times, they get the response back and say, hey,

20   look, Shanghai is not going anywhere, there's no point of

21   giving you guys an application.

22          MS. KIM:  Your Honor, we're not seeking to request

23   any production from counsel.  The case law is clear that

24   counsel does not have to go to Macau to prep or defend the

25   depositions.  We're seeking just requests that the witnesses or

32

1  counsel on the witnesses' behalf have sought for permission to
2  go to Macau, which we understand has already been done since
3  this has been ongoing since November and that they've already
4  been denied.

5       I don't know if the denial is by phone call or if
6  there's any kind of paper showing how many times they've done
7  this, how many times they've been denied, how recently they did
8  it.  All of that would be I think factoring into our five-page
9  brief due on Monday showing, you know, the balance of federal
10  procedure versus the Hague and what's been done so far
11  procedurally.

12       THE COURT:  At least as far as that application and
13  such goes, I don't think I need it for the briefing.  So I mean
14  if there is a form that was submitted, fine.  If it factors
15  into your briefing, you know, make those arguments and we'll
16  let ZTE respond to it.  But I'm -- personally I think my strong
17  assumption is any process that's an alternative to the Hague
18  will be faster than the Hague.  So whether or not they've done
19  an application is not really going to affect that.

20       So I'm not going to order production of that
21  information at this time.  Now if we get to a point where --
22  because I'm looking at the chart and it says ZTE has already
23  started the COVID travel restriction application process in
24  anticipation of Brazos' completing Hague process.  You know,
25  somehow if that gets called into question because of what

33

1  happens later, we can circle back to it.  But at least at this
2  point, I don't see any reason to delve much farther into it
3  than that.

4          MS. KIM:  Thank you, Your Honor.

5          THE COURT:  Okay.  So I'm not going to order you to
6  provide that information, Mr. Schulz.  But I will order the
7  parties to provide the briefing as described.

8          MR. SCHULZ:  Yes.  Thank you, Your Honor.

9          THE COURT:  Let's see.  The second issue, at least in
10 the chart that I have open, concerns the reasonably similar
11 products.  And so do -- it looks kind of like ZTE's -- really
12 ZTE's motion to compel.  So let's hear from Ms. Kim or Ms.
13 Dartevelle?

14         MS. KIM:  This will be me again, Your Honor.  You're
15 just stuck with me for just one more before I pass it on to Ms.
16 Lea.

17         Do you have any questions on this that I can answer
18 for you off the bat, Your Honor?

19         THE COURT:  No.  No, I do not.

20         MS. KIM:  Okay.  So discovery -- it's widely known
21 and case law that discovery is not necessarily limited to only
22 the limited set of products that are specifically identified in
23 the infringement contentions.  Broad discovery dictates that
24 discovery into other products that operate in a reasonably
25 similar manner are also fair game as long as defendant is on

34

notice of what our specific invention theories are by virtue of the infringement contentions.

Each of the products that we have in Exhibit C, Your Honor, I think -- I hope you have that exhibit available.  I think it's titled "429 Exhibit C" for Brazos.  All of those products operate in a manner reasonably similar to specific infringement theories that have already been disclosed to ZTE. Our final contentions, I believe, were served in June of last year, which is well before we had the benefit of discovery, particularly source code discovery which we just got pursuant to a hearing on March 3rd.  So we've only had very limited access recently to source code.

And I'd like to note here, Your Honor, that ZTE has never moved to strike our motion to -- our preliminary infringement contentions or our final contentions.  So in our mind, those are sufficient.  They have put ZTE on sufficient notice of what our specific infringement theories are.  We then, after being able to look at source code a little bit and go through the limited documents that we have, we noticed that vast series of products were not in the protection of source code or discovery.

So after being able to look at it in March, we asked on April 7th to get this discovery on, you know, several of the products that are reasonably similar.  They gave us a list of those that they say are not reasonably similar or, you know,

1 not sold in the U.S.  We then narrowed the list which is what

2 you have in front of Your Honor as Exhibit C.

3          And they're still refusing to give us discovery on

4 that even though they don't dispute that they do not operate in

5 a reasonably similar manner as those they've already accused

6 and set forth specifically in our infringement contentions.

7          THE COURT:  Okay.  Mr. Schulz, will you be responding

8 on the reasonably similar products issue?

9          MR. SCHULZ:  I will, Your Honor.

10          First of all, addressing the last point, we have made

11 the case that these are reasonably similar products.  And it's

12 not only in our chart, but it's also in letters.  As far as --

13 so my full response is two-fold.  So the Court has already

14 addressed -- Judge Albright has already addressed Brazos'

15 standard of similar products in the OnePlus case.  And then,

16 secondly, there's also a time component to this.

17          So as Heather indicated, they served their final

18 infringement contentions, it was actually on -- in July of

19 2021.  And they didn't provide this list of similar products

20 until April, last month, and it's almost double, sometimes --

21 arguably, it's triple the current list of accused devices.  So

22 roughly two months before the close of fact discovery, they're

23 trying to double and triple the amount of devices for

24 discovery.

25          But back to that first point of the actual standard

1  for similar products.  So their theory, the way I understand

2  it, is the products that they're trying to add are similar

3  because of the same operating system and the compliance with

4  standards like IEEE and Etsi, those kind of standards.

5          So the Court has already addressed the compliance

6  with the standards in the OnePlus.  It's WSOU Investments v.

7  OnePlus Technology, Case 6:20-CV-00952, Docket 77.  And in that

8  case, Judge Albright found that Brazos' understanding of

9  similar products was too broad.  It's not specific enough.  And

10 just merely identifying either Qualcomm Snapdragon chip set or

11 compliance with 3G, 4G, 5G standards or whether it's an LTE or

12 an LTE-A, those kind of criteria weren't sufficient for

13 identifying similar products, especially when Brazos refuses to

14 identify or deny or confirm whether these patents are standard

15 essential patents.

16         Now we've been asking for months, almost since the

17 beginning of the case whether any of these patents are standard

18 essential patents.  And they refused to confirm, deny.  So this

19 has already been addressed in the OnePlus case in the situation

20 where Brazos refuses to identify whether these are standard

21 essential patents.  Therefore, relying on compliance with

22 standards is improper to determine whether there are similar

23 products.

24         And that also applies to the source code.  A lot of

25 these devices, they run third-party Android -- third-party

37

1   Google Android operating software.  So when you start looking
2   at any device that runs the Android operating software and its
3   compliance with these certain IEEE and Etsi standards, this
4   just goes beyond ZTE products.  This is almost the entire
5   industry.

6          So this criteria is not appropriate for identifying
7   whether the products are sufficient -- similar or not.  It
8   needs to be narrowed down to determine whether the products are
9   similar or not.  They need to provide more guidance that is
10  actually based on the claim elements for each of the patents.
11  It can't just be based on standards, especially when the
12  plaintiff is unwilling to identify whether these are standard
13  essential patents.

14         And then, lastly, I briefly mentioned the time
15  component.  Like I said, they served their final infringement
16  contentions in July of 2021.  And they haven't provided a basis
17  why it took them almost nine months to add an additional two
18  times or three times the set of accused devices that they want
19  additional production on two months before close of fact
20  discovery.

21         MS. KIM:  Your Honor, may I respond --

22         THE COURT:  Certainly.

23         MS. KIM:  -- or do you have a question for Mr. Schulz
24  before I respond?

25         THE COURT:  Pardon?  I think it's to you, Ms. Kim.

1          MS. KIM:  Okay.  I didn't know if you had a question

2   for Mr. Schulz before you wanted me to respond.

3          First of all, on OnePlus, OnePlus is a completely

4   different situation than here.  We're actually counsel for

5   OnePlus.  That had to do with OnePlus' motion to strike our

6   preliminary infringement contentions.  That's not at issue

7   here.  ZTE, as I noted, had never moved to strike our

8   infringement contentions preliminary or otherwise.

9          OnePlus is also a different set of patents.  And in

10  OnePlus, I don't recall off the top of my head, I wasn't the

11  technical lead on that team, but in this case, none of the

12  patents, as Mr. Schulz knows, have been declared standard

13  essential.  And in any case, there's no prejudice to ZTE giving

14  us discovery on reasonable products which we didn't -- where we

15  weren't able to figure out whether they were reasonably similar

16  or not until we got access to discovery in their source code,

17  which we didn't get access to until March.

18         And so we got a court order on March 3rd saying they

19  had to give us source code.  We then started looking at source

20  code.  And on April 7th, we identified a bunch of products that

21  we don't have discovery on that operate in the same way as

22  those that are already set forth specifically on our

23  contentions which ZTE does not dispute are sufficient.

24         THE COURT:  Okay.  So and I guess --

25         MR. SCHULZ:  Your Honor, if I may real quick because

1  --

2          THE COURT:  Hold on.  Just let me make sure I'm up to

3  speed on what we're talking about here.  So I'm looking at --

4  let me see -- so I'm looking at one of the charts.  We've got

5  Issue 2.  Well, and I've got both the Exhibit C, which I've got

6  open in front of me, that has a chart of products that's titled

7  "Brazos Proposed Preliminary List Reasonably Similar Products

8  As Of April 28."  And then there's also the concept, I guess,

9  of saying -- I lost it in my stack of stuff here -- but

10 reasonably similar products being ones that implement a

11 specific IEEE standard.

12         So what's ZTE's position -- there it is.  What's

13 ZTE's position on Exhibit C, the list of products that are

14 there, other than I understand the delay argument?  But aside

15 from the delay argument, what --

16         MR. SCHULZ:  Yes.

17         THE COURT:  Go ahead.

18         MR. SCHULZ:  To clarify, because there are two

19 Exhibit Cs.  So are you referring to the one that says "As of

20 April 28th, 2022" at the top?

21         THE COURT:  Yes.

22         MR. SCHULZ:  Okay.  Well, as I indicated, if there's

23 a compliance with an Etsi or an IEEE standard, we've been

24 asking for their designations of whether these are standard

25 essential patents.  And that does play into if they're standard

40

1 essential, then that changes whether a product is

2 representative or not.  If they're not -- and that's part of

3 the OnePlus case.

4          Judge Albright actually indicated that if the -- the

5 list of products was not specific enough, particularly given

6 Brazos' unwillingness to confirm or deny that the asserted

7 patents are standard and essential.  And the Court went on, if

8 the patents are not standard and essential, Brazos must provide

9 analysis indicating why the highlighted information is indeed

10 representative.

11          So the "standard and essential" actually plays into

12 whether these standards apply and basically render the accused

13 products and the additional products similar or not.  So that's

14 part of the criteria.

15          And then as far as Chart C, if you look through a lot

16 of these, a lot --

17          THE COURT:  I'm sorry.  Did you say D or C?

18          MR. SCHULZ:  C.  C.  Chart C, right, with --

19          THE COURT:  Charlie?

20          MR. SCHULZ:  Charlie, correct.

21          THE COURT:  Okay.

22          MR. SCHULZ:  "As of April 28th, 2022" at the top.

23          Okay.  If you note, Your Honor, a lot of these are

24 mobile devices smartphones.  And in terms of operating

25 software, that's third-party Google Android operating software.

1          So for plaintiff to rely on the source code review,

2    we haven't produced Android operating software because that's

3    not ours to produce.  They have to go to Google for that.  So

4    to allege that this is based off of some source code review is

5    not entirely rooted in what these additional products are that

6    they're trying to add for discovery.

7          And, like I said, if that's the criteria, then that's

8    basically the entire industry because it's either an Android

9    Google operating software or it's an Apple operating software.

10   The bulk of these additional products are running Android

11   operating software.  So that can't alone -- that alone can't be

12   the criterial for identifying similar products because that's

13   the entire industry.

14         And you combine that with the compliance, there needs

15   to be some more specific details of how we separate, how we

16   figure out what's a similar product and what's not a similar

17   product.

18         THE COURT:  Well, at least figuring out -- the

19   plaintiffs have told us specifically which ones they think are

20   similar on Exhibit Charlie, as I see it.  The second question

21   about the IEEE standard and the industry standard seems -- that

22   seems like sort of a secondary issue.  And I understand you're

23   saying -- just saying that it complies with the standard and,

24   therefore, is reasonably similar when they haven't

25   characterized these as standard essential patents.

42

1    I understand what you're saying there.  I understand
2    it to be addressed more towards the I'll say nebulous world of
3    "reasonably similar products," as opposed to Exhibit C looks
4    like they've at least -- plaintiff feels like they've got some
5    basis to say the items on Exhibit Charlie are reasonably
6    similar to what they've accused and included in their
7    infringement contentions and are not relying on the IEEE
8    standard compliance alone to get there.

9         MR. SCHULZ:  Well, Your Honor, based off of their
10   briefing, they based it off of operating system and compliance
11   with the standards.  So if it's not the IEEE, then like I said,
12   it's based off of -- as an operating system.  And once again, a
13   lot of these devices are Android operating systems.  So there
14   needs to be some other criteria.  They need to give us some
15   other criteria of how they're identifying these as similar
16   products because they first provided this list in the beginning
17   of April.  So how were we supposed to know these were similar
18   products because they're basically asking for any Android
19   phone?

20        MS. KIM:  Your Honor, I just want to note that the
21   IEEE standard, that is only in some embodiments.  It's not all
22   products.  And like Your Honor has noted, we're not asking for
23   a whole universe of any product that runs Android, whether it's
24   a ZTE phone or not.  Currently, we've narrowed our list based
25   on (indiscernible) ZTE to just those in Exhibit C which in the

43

1  dispute chart that ZTE put together, they don't dispute that
2  they do not run in a reasonably similar manner to the
3  infringement theories already disclosed in our infringement
4  contentions.

5         MR. SCHULZ:  And, Your Honor, they haven't provided a
6  basis for why these are similar products beyond they all have
7  the same operating system and run the -- and when I say
8  standard, it's not limited to IEEE.  I believe there's several
9  IEEE standards in its patents, and there's also some Etsi --
10 there's a whole bunch of other standards, I believe.  But those
11 are just the two I remember from my engineering days, so I
12 recognize those.

13        But those aren't the only standards involved here.
14 So when I say compliance with standards, it's not limited to
15 just those two.  But that's the only two basis that they
16 provided us for this list, and as far as I can tell, there's
17 actually no similarities other than they run the same operating
18 system.  And as I already argued, that's not a basis for why
19 they're similar.  That's not a sufficient basis.  That's too
20 broad.

21        MS. KIM:  Your Honor, I can share a document, but it
22 is confidential, so we'll have to ask the public attendees to
23 leave, if you're interested in seeing where in our infringement
24 contentions we've disclosed this.

25        THE COURT:  Well, I tell you what, why don't you do

44

1  this.  Can you email the document and --

2          MS. KIM:  Yes, Your Honor.  I actually have them, and

3  they are highlighted, as well, the points I was going to show

4  you.  So let me just ask our paralegal to shoot those over to

5  you really quick.  What is your email, Your Honor?

6          THE COURT:  Sure.  And on this one, Mr. Tong is

7  working on it.  So it's --

8          MS. KIM:  Oh, we have his email.  We have Mr. Tong's

9  email.

10         THE COURT:  Okay.  I was going to say I'll have him

11 put it in the chat if you don't already have it.  There it is.

12         MR. SCHULZ:  In the meantime, if I may, Your Honor,

13 there's still the time component.  Like I said, a lot of this

14 is Android-based.  That's not dependent on the source code

15 review, so there's still a lack in explanation for why the

16 final infringement contentions were served in July 2021, and

17 it's been now almost nine months for them to identify these

18 products.

19         If it's based off of an Android operating system,

20 they could have done this before even filing the suit.  So

21 there's no explanation of the delay and the burden on ZTE.

22         THE COURT:  Well, I appreciate it.  I was kind of

23 smiling because a minute ago, you were saying we needed more

24 time.

25         MR. SCHULZ:  Well, we will need more time --

1              THE COURT:  I understand.

2              MR. SCHULZ:  -- with the close of fact discovery.

3              THE COURT:  I understand.

4              MR. SCHULZ:  Like if you do want us to collect this

5    information, it's almost double or triple the amount, and

6    that's the undue burden on us.  It's going to take us time to

7    collect this, and fact discovery is closing in two months.  I

8    know you indicated that you might push that close of fact

9    discovery, but it's still an undue burden on us.  They've

10   waited almost two years after the start of the suit to raise

11   these when as far as I can tell, it's based off of Android

12   operating system.  So I don't know why they couldn't have

13   raised this earlier in the suit.

14             THE COURT:  I understand.  I understand your point on

15   that.  And have you emailed the document yet, Ms. Kim, or --

16             MS. KIM:  I am about to hit send.  It's just I need

17   to click one more thing.  It's almost there.  It should be

18   coming through any moment now.

19             MR. SIEGMUND:  Judge, would you like me to address I

20   guess you could call it the "delay" in getting these reasonably

21   similar products identified because I mean I think it's --

22   okay.

23             THE COURT:  I don't really need it.  I appreciate it,

24   Mr. Siegmund, but I'll tell you I'm not -- if I decide that's

25   going to weigh in my decision, then I'll give you the

46

1 opportunity to address it.  But as I sit here now, it doesn't

2 really affect it.

3           MR. SIEGMUND:  Understood, Judge.  Thank you.

4      (Pause)

5           THE COURT:  And I believe our pause right now is as

6 we wait for the document to come through.

7           MS. KIM:  I'm CC'd on it.  And they come from

8 (indiscernible).

9           THE COURT:  Okay.  Good deal.  Hold on just a --

10          MS. KIM:  And Opposing Counsel, I just put it on the

11 same chain as the hearing being set, so hopefully everyone has

12 it.

13          THE COURT:  All right.  I tell you what, while we're

14 waiting on that, we're going to go off the record just real

15 quick to --

16     (Recess at 2:40 p.m./Reconvened at 2:42 p.m.)

17          THE COURT:  Okay.  We're back on the record.  I think

18 we've gotten an email from Ms. Kim that has -- it looks like

19 one, two, three, four -- six attachments.  Am I counting that

20 right?  Okay.

21          MS. KIM:  Yes, Your Honor.

22          THE COURT:  Okay.  Okay.

23          All right.  So go ahead and explain to me what you

24 wanted to explain with regard to these.

25          MR. SCHULZ:  Your Honor, I haven't received it yet.

47

1          MS. KIM:  Oh.

2          THE COURT:  It's a big file, so --

3          MR. SCHULZ:  So maybe, Heather, if you don't mind

4   sharing the screen, would that work or --

5          MS. KIM:  I think were not doing that because --

6          THE COURT:  We've got public attendees.

7          MR. SCHULZ:  Okay.  Right.

8          MS. KIM:  Right.

9          THE COURT:  Yeah.

10     (Pause)

11          MS. KIM:  Bradford, if you have our final

12   contentions, I can direct you to the chart and the page if you

13   have them.

14          MR. SCHULZ:  Okay.  The first chart?

15          MS. KIM:  The first chart, I'll just go through as an

16   example.

17          Your Honor, would you like me to cover all six of the

18   charts or just a couple?

19          THE COURT:  Just give me one example, yeah.  And I

20   will note that none of mine say first chart, so I need you to

21   tell me which patent.  It's got Claim Chart '232 patent, '495

22   case, that sort of thing.

23          MS. KIM:  Yeah.  For example, the claim chart, this

24   one's '060 patent '493 case.

25          THE COURT:  Got it.

48

1          MS. KIM:  And then Exhibit C, which is the chart I
2   was sharing with you earlier, Your Honor, this is for the
3   smartphones including the ZTE -- maybe it would help to share
4   that, but it's the Nubia, the Blade Z, Grand, other phones of
5   that nature.

6          And if we look on Page 1 of that particular chart,
7   the highlighted language there says, "ZTE provides mobile
8   devices" -- well, I won't say it, sorry.  I cant say it because
9   of the public Zoom hearing, but it's the first --

10          THE COURT:  I see it.

11          MS. KIM:  Yeah.  The very last paragraph there.  And
12   then Figure 1.  And so the infringement contentions and the
13   theories disclosed there are that each of the smartphones can
14   act as the mobile device running on Android OS and provides a
15   feature to synchronize the data between any two ZTE devices.
16   And that's an example of one.

17          Oh, sorry, one second.  Each of these smartphones --
18   I was reading the wrong one.  Each of these smartphones
19   provides the Enhanced Voice Services or EVS functionality
20   following the 3GPP Etsi voiceover IP standard, as an example.

21          THE COURT:  Okay.  So what I'm going to do is at
22   least from what I've seen, from what I've heard, my evaluation
23   of it, I think the chart, Exhibit C, is titled "4.29 Dispute
24   Brazos EX.C-Reasonably Similar Products List," and the document
25   itself says -- is titled "Brazos Proposed Preliminary List

1  Reasonably Similar Products As of April 28, 2022."

2          I am going to require production of information

3  related to the products on that list.  The more general

4  description of "reasonably similar products" is from the

5  Court's perspective unworkable for enforcement purposes.  So if

6  you identify more specific products, you know, we can address

7  those.  But -- and now my computer's locking up.

8          We can address those, but I'll deny it with regard to

9  the more general descriptor of reasonably similar products.

10  But I will grant the plaintiff's requested relief and require

11  production of documents related to the products on Exhibit C.

12          And my Word application has locked up on me, so I'm

13  not sure what our next topic would be.

14          Yeah.  Why don't we do this, we're going to take a

15  recess just real quick so we could take a quick break.  And

16  hopefully by the time we get back -- point me to what you think

17  the next topic will be.  Hopefully by then, I can get my

18  computer unlocked and also take care of some other stuff real

19  quick during the recess.

20          MS. KIM:  Your Honor?

21          THE COURT:  Oh, there we go.  Let's do this.  Ms.

22  Copp once again reminded me of how awesome she is at her job to

23  say let's take a 15-minute recess and then let's log back on on

24  the private link.  And we'll get that emailed out to everybody

25  during the recess.

50

1   All right?  So we'll be back on.  I've got 2:47

2 Central Time, so we'll be back on at 3:05 Central Time, roughly

3 15 minutes from now.  And we'll finish this up.

4   MS. KIM:  Thank you, Your Honor.

5   MR. SCHULZ:  Thank you, Your Honor.

6  (Recess at 2:47 p.m./Reconvened at 3:09 p.m.)

7  (The sealed portion of the proceedings which took place

8 from 3:09 p.m. to 3:56 p.m. are contained in a separate

9 transcript that is filed on the docket under seal.)

10     * * * * *

11

12

13

14

15   **C E R T I F I C A T I O N**

16   I, DIPTI PATEL, court approved transcriber, certify

17 that the foregoing is a correct transcript from the official

18 electronic sound recording of the proceedings in the above-

19 entitled matter, and to the best of my ability.

20

21 /s/ Dipti Patel

22 DIPTI PATEL, CET-997

23 LIBERTY TRANSCRIPTS    DATE: May 19, 2022

24

25